Marshall Kenneth **FLOWERS**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 05–1163C.

United States Court of Federal Claims.

Jan. 18, 2008.

---

Marshall Kenneth Flowers, Adelaide, Australia, pro se.

Meredyth D. Cohen, United States Department of Justice, Washington, DC, for defendant.

## *OPINION AND ORDER*

SWEENEY, Judge.

Before the court are defendant's "Motion to Dismiss or, in the Alternative, for Judgment Upon the Administrative Record, in Part, and for Summary Judgment" ("Def.'s Mot."), plaintiff's "Cross–Motion for Judgment Upon the Administrative Record or[,] in the Alternative[,] Motion for Summary Judgment and Opposition and [sic] to Defendant's Motion to Dismiss or, in the Alternative, for Judgment Upon the Administrative Record, in Part, and for Summary Judgment, in Part; and Affidavit of Marshall K. Flowers" ("Pl.'s Mot."), defendant's reply ("Def.'s Reply"), and plaintiff's response ("Pl.'s Resp."). In *Flowers v. United States,* 75 Fed.Cl. 615 (2007), this court granted summary judgment in favor of defendant with respect to Count V (violation of a contractual agreement by the Treasury Department regarding savings bonds) and Count VI (breach of contract for damage to household goods) of plaintiff's amended complaint. Now addressing plaintiff's allegations contained within Counts I through IV, the court, for the reasons stated below, denies plaintiff's cross-motion and grants defendant's motion.

## I. BACKGROUND

### A. Factual Background[1]

The court previously detailed the underlying facts in this case in its opinion dated March 1, 2007. *See Flowers,* 75 Fed.Cl. at 616–23. Therefore, the court recites a brief

---

1. The facts are derived from the administrative record ("AR"), plaintiff's amended complaint ("Am.Compl."), plaintiff's cross-motion, and defendant's appendix ("Def.'s App.").

overview to facilitate an understanding of plaintiff's remaining claims.

### 1. Plaintiff's Military Service

Plaintiff Marshall K. Flowers entered the United States Army ("Army") in Jacksonville, Florida on April 30, 1971. AR 336, 570. On May 14, 1997, plaintiff reenlisted for a period of two years, with his term of enlistment expiring on May 13, 1999. *Id.* at 1148–53. Plaintiff was honorably discharged from the Army on February 1, 2000. *Id.* at 1155–57. When he left the Army, plaintiff was serving with the 25th Infantry Division as a food service sergeant major. *Id.* at 908, 1031, 1155. Throughout his service, plaintiff received several commendations for outstanding performance. *Id.* at 908, 1159–83.

The Army began investigating plaintiff for theft after plaintiff allegedly returned items to the Army and Air Force Exchange Service and Navy Exchange (collectively "exchange systems") between September 1996 and December 1997 without receipts and in exchange for cash. *Id.* at 661–63. On December 13, 1997, security personnel at the exchange systems detained plaintiff. *Id.* at 662. Five days later, on December 18, 1997, the Army authorized a search warrant of plaintiff's quarters, *id.* at 677–80, and seized numerous items valued at $17,923.59, *id.* at 665, 667. The Army also found and seized fourteen exchange systems sales receipts, two of which appeared authentic, one of which "contained white out over the area which described the item purchased," and the remainder of which "had the item description blank." *Id.* at 665–66. In a report dated March 27, 1998, the Army's Criminal Investigation Command determined that probable cause existed to believe that plaintiff conspired with his wife to steal from and to defraud the exchange systems by returning stolen property for cash. *Id.* at 661–74. On April 8, 1998, plaintiff's commander preferred charges against plaintiff for forty-two counts of larceny under the Uniform Code of Military Justice ("UCMJ"). *Id.* at 686–91.

Article 32 of the UCMJ requires that an investigative proceeding occur before a court-martial may be convened. 10 U.S.C. § 832 (2000). An Article 32 proceeding is "the military counterpart to a civilian grand jury." *Morgan v. Perry,* 142 F.3d 670, 677 (3d Cir.1998), *cert. denied sub nom. Morgan v. Cohen,* 525 U.S. 1070, 119 S.Ct. 801, 142 L.Ed.2d 662 (1999). The Army conducted an Article 32 hearing pursuant to the UCMJ on June 25, 1998. *See* AR 227–39. On July 16, 1998, the investigating officer completed the Article 32 investigation report, wherein he determined that sufficient evidence existed to "reasonably conclude" that plaintiff violated UCMJ Article 121, Larceny, with respect to sixteen of the forty-two charges. *Id.* at 715. The report recommended trial by general court-martial. *Id.*

On July 26, 1998, ten days following the issuance of the Article 32 investigation report, plaintiff signed a plea bargain agreement entitled "Memorandum of Agreement for Alternative Disposition of Charges" ("July 26 agreement") in which he accepted nonjudicial punishment ("NJP") pursuant to Article 15 of the UCMJ and agreed to retire from the Army. *Id.* at 708. In exchange, the Army would "withdraw with prejudice all charges against [plaintiff] upon imposition of Article 15, UCMJ punishment" and return specific items that had been seized from plaintiff's quarters. *Id.* The agreement indicated that plaintiff "consulted with his military and civilian counsel prior to entering this agreement." *Id.; see also id.* at 571 (indicating same).

The Army's Division Support Command ("DISCOM") commander rejected the offer to dispose of the case by NJP. *Id.* at 571. *But see id.* at 706 (stating, in a memorandum from Colonel Eddie Coleman to plaintiff on July 29, 1998, that "the Forty–Two Specifications of the Charge, violations of the UCMJ Article 121, preferred on 9 April 1998, are hereby withdrawn and dismissed"). Plaintiff subsequently requested trial by court-martial.[2] *Id.* at 701; *see also* Pl.'s Mot. 16

---

**2.** In his amended complaint, plaintiff states that "[b]etween June 26–29, 1998[,] Plaintiff informed ... [military defense counsel] of the desire to withdraw the document bearing his signature

titled 'Memorandum of [A]lternate [D]isposition.'" Am. Compl. ¶ 60; *see also id.* ¶ 62 (indicating that plaintiff was not permitted to withdraw a document dated June 26, 1998). *But see*

(indicating that plaintiff made "continuous request[s] that charges be referred to court-martial"). In a memorandum to plaintiff, plaintiff's military counsel explained the ramifications of proceeding with a trial by court-martial as opposed to accepting NJP pursuant to Article 15:

> [D]isposition by article 15 is a total victory for the defense in this case. You will not have to face trial by court-martial, and you will be permitted to retire with the rank and privileges of a Sergeant–Major with 28 years of experience.
>
> a. Consequences of Article 15. You will not face trial by court-martial. The maximum penalty you may receive is an admonition/reprimand, forfeiture of 1/2 of 1 month's pay for 2 months, and 45 days of extra duty and restriction. By regulation, such extra duty cannot demean your position as a noncommissioned officer. You would not have a federal conviction.
>
> b. Consequences of a Court-martial. If convicted of the Charge and all specifications, you could lawfully receive a dishonorable discharge, reduction to the lowest enlisted grade, confinement for up to 183 years, and a fine....

AR 709–10. After reading this memorandum, plaintiff indicated a desire to proceed to trial by court-martial. *Id.* at 710; *see also id.* at 571 ("[O]n 17 August 1998, [plaintiff] demanded trial by court-martial."). The memorandum is part of the administrative record because plaintiff included it as an exhibit in his application for correction of military records dated May 7, 2002. *See id.* at 578–83 (containing plaintiff's cover letter, table of contents, and list of enclosures); *infra* Part I.A.2. Thus, any attorney-client privilege that would have attached to the memorandum has been waived.

A new DISCOM commander subsequently assumed command and accepted the terms of the July 26 agreement. AR 571. On August 22, 1998, a second plea bargain agreement entitled "Memorandum of Agreement for Alternative Disposition of Court Martial Charges" ("August 22 agreement") was executed by plaintiff, plaintiff's civilian counsel, and Colonel Coleman. *Id.* at 738. The August 22 agreement, which superseded but was similar to the July 26 agreement, provided that plaintiff would "take whatever steps are required to out-process for retirement" and would not participate in any retirement ceremony. *Id.* In exchange, the Army would withdraw the charges against plaintiff and return specific items that had been seized from plaintiff's quarters. *Id.* The August 22 agreement also indicated that plaintiff "consulted with military and civilian counsel prior to entering this agreement." *Id.*

In accordance with the August 22 agreement, plaintiff accepted his punishment under Article 15, *id.* at 830–32, 878, and applied for voluntary retirement on August 28, 1998, *id.* at 571, 790. In his application for retirement, plaintiff requested that he be placed on the retired list effective March 1, 1999. *Id.* at 571. Plaintiff's NJP was imposed and consisted of a formal reprimand, *id.* at 871, 1190, and forfeiture of $1,788 per month for two months, *id.* at 830, 871. On August 31, 1998, three days after accepting his punishment, plaintiff filed an Article 15 appeal in which he sought relief from "unjust, prejudicial[,] and inappropriate punishment." *Id.* at 591. Plaintiff's appeal was denied on September 2, 1998. *Id.* at 832.

The Army also imposed upon plaintiff a bar to reenlistment, which became effective on May 12, 1999. *Id.* at 572, 871. The bar was imposed in April 1999 rather than in August 1998 because the commander "only recently learned that a bar had not been imposed previously, as would have been appropriate." *Id.* at 871. The basis for the bar to reenlistment was the Article 15 punishment imposed upon plaintiff on August 28, 1998. *Id.* at 878; *see also id.* at 895 ("[Plaintiff] was barred from reenlistment for misconduct that resulted in his punishment under Article 15.... The bar is final. He may not reenlist."). Plaintiff appealed this bar, *id.* at 878–79, but commanding officers ad-

AR 709 (stating, in a memorandum from plaintiff's military counsel to plaintiff, that "[i]n late July 1998 to early August 1998, you indicated that you no longer desired to accept the article 15 disposition"). Therefore, plaintiff apparently expressed a desire to withdraw the July 26 agreement between July 26–29, 1998.

vised that the bar to reenlistment remain in place, *id.* at 858–66. Plaintiff's appeal was denied on June 21, 1999. *Id.* at 572.

Although his Article 15 punishment was imposed on August 28, 1998, plaintiff apparently "chose not to put in his retirement paperwork," and charges were repreferred for the same underlying conduct. *Id.* at 878; *see also id.* at 829 (stating, on a routing and transmittal slip dated April 5, 1999, that charges were "re-preferred after SGM F[lowers] did not put in his retirement" and that, "[a] far as SGM F[lowers] is concerned[,] this Art[icle] 15 should not be processed"). These charges included plaintiff's wife as an accomplice. *Id.* at 572; *see also id.* at 804–06 (alleging on a charge sheet dated November 13, 1998, that plaintiff and his wife had conspired to commit larceny); *id.* at 807 (containing the November 13 charge sheet allegations that plaintiff's wife "scanned" copies of receipts obtained from the exchange systems, "whited out and then made multiple photo copies" of an exchange systems receipt, and stole various items of property). Another Article 32 hearing was held on November 25, 1998,[3] *id.* at 572, and the investigating officer completed her report on March 29, 1999, *id.* at 815–27. The investigating officer ultimately determined that the evidence against plaintiff and his wife did not support a finding beyond a reasonable doubt, *id.* at 820, and the Army withdrew these charges on June 28, 1999,[4] *id.* at 884.

During the period of time in which charges were repreferred against plaintiff, the Army authorized plaintiff to remain on active duty past May 13, 1999, the date his term of service expired, because its investigation into whether plaintiff violated Article 121 of the UCMJ remained pending. Am. Compl. ¶¶ 3–5; AR 327–28. On June 28, 1999, the Army revoked its authorization to extend plaintiff's expiration of his term of service. AR 333, 469; *see also id.* at 475 ("[T]he Army has no authority to retain [plaintiff] in the Army any longer. His current term of service has expired. . . .").

Following its revocation of the authorization to extend plaintiff's term of service, the Army offered plaintiff the choice of either submitting a request for retirement or being discharged from the Army for expiration of term of service.[5] *Id.* at 333, 469, 475. On July 20, 1999, plaintiff submitted an "Application for Voluntary Retirement." *Id.* at 336. In his application, plaintiff requested a retirement date of January 1, 2000. *Id.* (indicating a discharge date of December 31, 1999); *see also id.* at 337 ("Service Member request[s] retirement for length of service . . . on 1 January 2000[.]"). On July 29, 1999, orders were published directing plaintiff's retirement to become effective on January 1, 2000. *Id.* at 383–84. Plaintiff subsequently requested that his retirement be delayed until February 1, 2000, *id.* at 378, and the Army approved his request, *id.* at 377, 572. *But see id.* at 903 (recommending disapproval of plaintiff's request for an extension of his retirement date from January 1, 2000, to February 1, 2000). Plaintiff was released

---

3. Although plaintiff's civilian counsel apparently withdrew his representation at the commencement of the Article 32 hearing, plaintiff was represented by military counsel. AR 815.

4. The Army's withdrawal of the larceny and conspiracy charges against plaintiff and his wife had no effect upon plaintiff's NJP, which stemmed from the earlier charges filed solely against plaintiff. *But see* AR 803 (suggesting, in an electronic mail message from Lieutenant Colonel D. Head to Major Myron Reineke dated February 18, 1999, that the Article 15 punishment "has been technically withdrawn").

5. If plaintiff elected retirement, then he was required to retire "on or before 1 August 1999." AR 333, 469. It is unclear whether plaintiff was required to set a retirement date on or before August 1, 1999, or to retire on or before that date. The administrative record contains conflicting statements. Plaintiff acknowledged, on or about June 28, 1999, that his "request for retirement must be for a date on or before 1 August 1999." *Id.* at 471; *see also* Am. Compl. ¶ 38 (stating that plaintiff was given notice to "put in for retirement with a retirement date effective August 1, 1999"). Nonetheless, according to a letter from the Staff Judge Advocates to plaintiff's civilian counsel dated July 12, 1999, plaintiff "ha[d] until the end of today, July 12, 1999, *not August 1, 1999, to submit his request for voluntary retirement.*" AR 474 (emphasis added). Regardless of this discrepancy, the August 1 date is later than both May 13, 1999, the date on which plaintiff's enlistment term expired, and June 28, 1999, the date on which the Army revoked its authorization to extend plaintiff's expiration of his term of service.

from active duty on January 31, 2000, and was transferred to the retired list effective February 1, 2000. *Id.* at 572, 1155–57. Plaintiff received military pay through January 31, 2000. AR Vol. IV at 28–29.[6]

### 2. Plaintiff's Requests for Correction of Military Records

In April 2000, plaintiff submitted an appeal to the Enlisted Special Review Board ("ESRB") seeking correction of his Noncommissioned Officer Evaluation Report ("NCOER") covering the period from July 1997 through August 1998. AR 572. Plaintiff maintained that the report should be removed from his record because it was intentionally and illegally changed. *Id.* On November 30, 2000, the ESRB concluded that plaintiff failed to submit sufficient evidence and denied his appeal. *Id.* at 573.

In May 2002, plaintiff applied for correction of his military records with the Army Board for Correction of Military Records ("Correction Board"). *Id.* at 578–971. In a July 25, 2002 memorandum, *id.* at 569–75, the Correction Board determined that plaintiff "failed to submit evidence" showing that the record was "in error or unjust." *Id.* at 573. The Correction Board further found that plaintiff's NCOER was "administratively correct," that plaintiff was not denied effective assistance of counsel, and that plaintiff had the opportunity to demand trial by court-martial but instead accepted NJP. *Id.* at 574. It explained that "the command took the appropriate steps to ensure that the applicant's rights were protected." *Id.* With respect to plaintiff's contention that his NJP was unjustly imposed upon him, the Correction Board determined that argument was "without merit." *Id.* at 574. It added:

> The applicant had the opportunity to demand trial by court-martial and while he exercised that option at one point, after consulting with his military and civilian counsel, he subsequently withdrew his demand and entered into an agreement to accept NJP and request retirement in return for the government's dismissal of charges. While he may now believe that

he made the wrong choice, he should not be allowed to change his mind at this late date, especially considering the seriousness of the charges against him.

*Id.; see also id.* at 538 (indicating that plaintiff, "in accordance with a plea agreement, agreed to accept [NJP] . . . and to submit his request for retirement. In return, the government agreed to withdraw all charges against him upon imposition of the [NJP]").

Plaintiff filed a second application with the Correction Board on July 30, 2002, *id.* at 542–66, alleging that the NCOER was "prejudicial and resulted from prejudices, failure to follow regulations and improper and unsupported allegation of wrong doing [sic]," *id.* at 544. The Correction Board denied plaintiff's request for correction of his military records on January 30, 2003. *Id.* at 536–39. Although it found that plaintiff was not provided counseling and was not advised of his specific duties as required under applicable regulations, *id.* at 538B, the Correction Board nonetheless concluded that "there is no evidence[,] and the applicant has not provided any, to show that the report is unfair and unjust." *Id.* at 538B–39. Moreover, the Correction Board noted that plaintiff's record contained a favorable evaluation and demonstrated no prejudicial conduct on the part of any official rating plaintiff's performance. *Id.* at 539.

On May 31, 2003, plaintiff appealed the Correction Board's decisions of July 25, 2002, and January 30, 2003, *id.* at 9–533 (containing plaintiff's application, statement, and exhibits), and the Correction Board denied the appeal on March 30, 2004, *id.* at 2–8. It noted that it "had already determined in its 26 July 2002 review of this case that there was no error or injustice in the imposition of [plaintiff's] NJP" and that "there was no evidence or injustice in the imposition of the applicant's NJP and [Memorandum of Reprimand]." *Id.* at 7. Furthermore, the Correction Board stated that plaintiff "did not submit any new evidence or argument which would overcome the Board's previous conclusion that there were no errors or injustices in

---

6. Volume IV of the administrative record, which contains plaintiff's payroll statements, is paginated separately from plaintiff's personnel records contained in Volumes I through III of the administrative record.

his case." *Id.* After reviewing the evidence against plaintiff in light of a decision by the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit"), which ruled that the Army lacked a legal basis to issue a subpoena for plaintiff's financial records, *see Flowers v. First Hawaiian Bank,* 295 F.3d 966, 976 (9th Cir.2002), the Correction Board concluded that the erroneously issued subpoena "does not create any error or injustice on any of the issues raised by the applicant. In other words, an error occurred, but it did not prejudice the substantial rights of the applicant." AR 7. The Correction Board concluded that the "evidence presented [did] not demonstrate the existence of a probable error or injustice." *Id.* at 8.

### 3. Plaintiff's United States Savings Bond Purchases

During his service in the Army, plaintiff purchased United States Savings Bonds ("savings bonds") in the names of his daughters. Am. Compl. ¶¶ 95, 97–99; Def.'s App. 2 (indicating that plaintiff purchased twelve savings bonds, all of which were registered in the names of his daughters, between June 1986 and January 1987). According to plaintiff, Army personnel, or others acting at the direction of the Army, confiscated his suitcase containing approximately $23,000 in savings bonds following a military flight from California to South Carolina on August 30, 2000. Am. Compl. ¶ 104. *But see* Def.'s App. 18 (stating, in an "Affidavit of Loss/ Theft" executed by plaintiff on November 3, 2000, that the estimated amount of the savings bonds was $21,000). On September 7, 2000, plaintiff notified the United States Department of the Treasury Bureau of Public Debt ("Bureau of Public Debt") that these savings bonds were "removed without [his] knowledge and/or consent" and requested assistance for having the savings bonds "replaced and placed in another name." Def.'s App. 17.

On October 5, 2000, plaintiff submitted a claim with the Bureau of Public Debt requesting replacement of the savings bonds in his son's name. Am. Compl. ¶ 111. Plaintiff acknowledged in his claim that, although he was not the registered owner, he filed the claim because he "[p]urchased bonds and retained [them]." Def.'s App. 20. Plaintiff's claim was subsequently denied because the savings bonds were listed in plaintiff's daughters' names. Am. Compl. ¶¶ 112–13; *see also* Def.'s App. 23–24 (indicating, in a letter from the Bureau of Public Debt to plaintiff dated July 24, 2002, that plaintiff previously acknowledged in correspondence dated December 7, 1999, that plaintiff's daughters owned the bonds); *id.* at 25 (stating that plaintiff was advised that his daughters had to request any change in the bond registrations and that plaintiff's application was rejected because plaintiff's daughters did not join in the claim). Plaintiff's daughters, the registered owners of the bonds, submitted claims for the stolen bonds on their own and were reimbursed. Def.'s App. 62.

On December 17, 2001, plaintiff filed a lawsuit in state court against his daughters seeking a judicial determination that he was the rightful owner of the savings bonds. *Id.* at 66. Lacking the knowledge that plaintiff's daughters previously received payments on the stolen bonds, the trial court issued a default judgment against plaintiff's daughters, concluded that plaintiff was the rightful owner of the bonds, and ordered that the stolen bonds be replaced in plaintiff's name. *Id.* On January 14, 2003, plaintiff then filed a complaint in the United States District Court for the District of Hawaii seeking an order requiring that the Secretary of the Treasury reissue the bonds in plaintiff's name. *Id.* at 42. The court ruled that it lacked jurisdiction over plaintiff's claim relating to the savings bond valued in excess of $10,000 since jurisdiction rested exclusively with the United States Court of Federal Claims ("Court of Federal Claims").[7] *Id.* at 68. It dismissed

---

7. Plaintiff requested that the district court order the United States government to reissue the savings bonds in his name under the Little Tucker Act, 28 U.S.C. § 1346(a)(2)(2000). Def.'s App. 42–61. The Little Tucker Act provides:

The district courts shall have original jurisdiction, concurrent with the United States Court

of Federal Claims, of ... [a]ny ... civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the

plaintiff's remaining claims because plaintiff, who was not the owner of the stolen savings bonds, lacked standing. *Id.* at 69–70. The Ninth Circuit affirmed, noting that the "only interest [plaintiff] claims in the bonds is the ownership interest supposedly established by the state court judgment. But 'registration is conclusive of ownership.' [Plaintiff] is not the registered owner and cannot . . . rely on a contrary state court judgment to establish ownership." *Flowers v. Sec'y of the U.S. Dep't of Treasury,* 132 Fed.Appx. 728, 729 (9th Cir.2005) (quoting 31 C.F.R. § 353.5(a) (2000)) (citation omitted).

### B. Procedural Background

The court provided a detailed recitation of the procedural background in this case in its earlier ruling. *See Flowers,* 75 Fed.Cl. at 623–24. Consequently, only a brief summary is necessary. Plaintiff filed a complaint in this court on October 31, 2005. On April 20, 2006, plaintiff filed his first motion to amend the complaint, which the court granted on June 16, 2006. Plaintiff subsequently filed his first amended complaint on June 27, 2006. In his first amended complaint, plaintiff seeks relief for the following: coercion into accepting NJP through obstruction of justice by the Army (Count I); coercion through intimidation and violation of regulations by the Army (Count II); violation of Fifth Amendment due process and liberty interests (Count III); violation of Fifth Amendment rights flowing from the Army's alleged seizure of savings bonds (Count IV); violation of a contractual agreement by the United States Department of the Treasury regarding the savings bonds (Count V); and breach of contract for damage to household goods (Count VI). In response to plaintiff's amended complaint, defendant moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") or,

in the alternative, to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6) or, in the alternative, for judgment upon the administrative record pursuant to RCFC 56.1 with respect to Counts I through IV.[8] Defendant also moved for summary judgment pursuant to RCFC 56 with respect to Counts V and VI. On March 1, 2007, the court granted defendant's motion for summary judgment with respect to Counts V and VI of plaintiff's amended complaint. *Id.* at 616, 628–36. Plaintiff subsequently filed a "Motion for Reconsideration and/or Motion to Certify for Interlocutory Appeal of the March 1, 2007 Opinion and Order Under 28 USC § 1292(d)(2) [sic] or[,] in the Alternative[,] to Transfer Court Non–Jurisdictional [sic] Counts to the Appropriate United States District Court Pursuant to 28 U.S.C. § 1631 and Motion to Amend Complaint" on March 13, 2007. The court denied plaintiff's motions for reconsideration, to certify for interlocutory appeal, and to transfer on March 21, 2007. On April 12, 2007, it denied plaintiff's motion to amend the complaint. Pursuant to the court's opinion and order dated March 1, 2007, plaintiff filed his cross-motion and opposition to defendant's motion with respect to the remaining counts before the court. Defendant filed its reply, and plaintiff filed a response.

## II. LEGAL STANDARDS

### A. *Pro Se* Plaintiff

The Court of Federal Claims holds pleadings of a *pro se* plaintiff to less stringent standards than litigants represented by counsel. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Courts have "strained [their] proper role in adversary proceedings to the limit, searching . . .

---

United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . .

28 U.S.C. § 1346(a)(2). The Court of Federal Claims possesses exclusive jurisdiction for claims exceeding $10,000, "unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *E. Enters. v. Apfel,* 524 U.S. 498, 520, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

8. The court replaced RCFC 56.1 with RCFC 52.1. *See* RCFC 52.1, Rules Committee Note (June 20, 2006). At the time defendant filed its motion, the court had not ordered that this case would be governed by the new rules. Def.'s Mot. 1 n. 1. In its Order dated September 5, 2006, the court applied the new rules to proceedings in this case. Therefore, defendant's motion for judgment on the administrative record is governed by RCFC 52.1.

to see if plaintiff has a cause of action somewhere displayed." *Ruderer v. United States,* 188 Ct.Cl. 456, 412 F.2d 1285, 1292 (1969). Although plaintiff's pleadings are held to a less stringent standard, such leniency "with respect to mere formalities does not relieve the burden to meet jurisdictional requirements." *Minehan v. United States,* 75 Fed. Cl. 249, 253 (2007); *see also Kelley v. Dep't of Labor,* 812 F.2d 1378, 1380 (Fed.Cir.1987) ("[A] court may not similarly take a liberal view of that jurisdictional requirement and set a different rule for *pro se* litigants only."); *Bernard v. United States,* 59 Fed.Cl. 497, 499 (2004) (noting that *pro se* plaintiffs are not excused from satisfying jurisdictional requirements), *aff'd,* 98 Fed.Appx. 860 (Fed. Cir.2004). As the Court of Federal Claims stated in *Demes v. United States,* 52 Fed.Cl. 365, 369 (2002), "[w]hile a court should be receptive to *pro se* plaintiffs and assist them, justice is ill-served when a jurist crosses the line from finder of fact to advocate."

### B. Subject Matter Jurisdiction

Subject matter jurisdiction is "an inflexible threshold matter that must be considered before proceeding to evaluate the merits of a case." *Matthews v. United States,* 72 Fed. Cl. 274, 278 (2006). Subject matter jurisdiction may be challenged at any time by the parties, by the court *sua sponte,* or on appeal. *Folden v. United States,* 379 F.3d 1344, 1354 (Fed.Cir.2004), *cert. denied,* 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005).

The Court of Federal Claims is a court of limited jurisdiction. *Jentoft v. United States,* 450 F.3d 1342, 1349 (Fed.Cir.2006). The scope of this court's jurisdiction to entertain claims and grant relief depends upon the extent to which the United States has waived its sovereign immunity. *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Id.* Unless Congress consents to a cause of action against the United States, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." *United States v. Sherwood,* 312 U.S. 584, 587–88, 61 S.Ct. 767, 85 L.Ed. 1058 (1941).

The Tucker Act, 28 U.S.C. § 1491 (2000), confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* § 1491(a)(1). Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, it " 'itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.' " *Greenlee County, Ariz. v. United States,* 487 F.3d 871, 875 (Fed.Cir.2007) (quoting *Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir. 2005)).

The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1554 (Fed.Cir.1994). In order to find that a statute or regulation is money-mandating, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967), *abrogated in part on other grounds by Malone v. United States,* 849 F.2d 1441, 1444–45 (Fed.Cir.1988); *see also id.* at 1009 ("Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.")

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has stated:

When a complaint is filed alleging a Tucker Act claim[,] ... the trial court at the outset shall determine ... whether the Constitutional provision, statute, or regulation is one that is money-mandating.

If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course. For purposes of the case before the trial court, the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.

If the court's conclusion is that the source as alleged and pleaded is not money-mandating, the court shall so declare, and shall dismiss the cause for lack of jurisdiction, a Rule 12(b)(1) dismissal—the absence of a money-mandating source being fatal to the court's jurisdiction under the Tucker Act.

*Fisher*, 402 F.3d at 1173. The Court of Federal Claims "may not entertain claims outside this specific jurisdictional authority." *Adams v. United States*, 20 Cl.Ct. 132, 135 (1990).

The Court of Federal Claims lacks jurisdiction to entertain tort claims. The Tucker Act expressly provides that the "United States Court of Federal Claims shall have jurisdiction ... in cases *not sounding in tort.*" 28 U.S.C. § 1491(a)(1) (emphasis added); *see also Alves v. United States*, 133 F.3d 1454, 1459 (Fed.Cir.1998) ("To the extent that ... allegations sound in tort, the Court of Federal Claims lacks jurisdiction under the Tucker Act...."). Additionally, the court "lacks jurisdiction to award plaintiff's prayer for damages for emotional distress and pain and suffering." *Pratt v. United States*, 50 Fed.Cl. 469, 482 (2001).

### C. Motion to Dismiss—RCFC 12(b)(1)

The court's "general power to adjudicate in specific areas of substantive law ... is properly raised by a [Rule] 12(b)(1) motion." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed.Cir.1999). When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. *See McNutt v. Gen. Motors Acceptance Corp. of*

*Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the nonmoving party. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Reynolds*, 846 F.2d at 747. If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. *See McNutt*, 298 U.S. at 189, 56 S.Ct. 780. In deliberating a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds*, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. *Matthews*, 72 Fed.Cl. at 278; *see also* RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

### D. Motion to Dismiss—RCFC 12(b)(6)

The United States Supreme Court ("Supreme Court") recently clarified the standard with respect to the degree of specificity with which a plaintiff must plead facts sufficient to survive a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (citation & quotation marks omitted). Further, the Court pointed out that while a complaint does not need to contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are

true (even if doubtful in fact)." [9] *Id.* (citation & footnote omitted). Thus, in reviewing an RCFC 12(b)(6) motion, this court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co. v. United States,* 464 F.3d 1325, 1327–28 (Fed.Cir.2006) (citations & quotation marks omitted). Additionally, this court must decide " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683).

### E. Judgment on the Administrative Record

Pursuant to RCFC 52.1, the Court of Federal Claims reviews an agency decision based on the administrative record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed. Cir.2005).[10] The standard for judgment on the administrative record, given all of the disputed and undisputed facts in the administrative record, is whether the plaintiff has shown that the decision was not in accordance with law. *A & D Fire Prot., Inc. v. United States,* 72 Fed.Cl. 126, 131 (2006); *see also Bannum,* 404 F.3d at 1357 (instructing the court to make "factual findings from the record evidence as if it were conducting a trial on the record"). "The resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." *Baird v. United States,* 77 Fed.Cl. 114, 116 (2007). Contrary to a summary judgment proceeding, a genuine issue of material fact will not foreclose judgment on the administrative record. *Bannum,* 404 F.3d at 1356.

### F. Review of Correction Board Decisions

Where a plaintiff appeals to the Court of Federal Claims after having been denied relief by a Correction Board, the Court of Federal Claims "necessarily serves as a reviewing body to the [Correction Board] when it adjudicates plaintiff's complaint." *Longhofer v. United States,* 29 Fed.Cl. 595, 599 (1993). Any military board decision before the court "is subject to a narrow standard of review." *Marin v. United States,* 41 Fed.Cl. 129, 132 (1998) (citing *Ferrell v. United States,* 23 Cl.Ct. 562, 567 (1991)). The court "cannot substitute [its] judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983); *see also Donahue v. United States,* 33 Fed.Cl. 507, 510 (1995) (stating that judicial review of a Correction Board decision "does not require a reweighing of the evidence, but rather a simple determination that a reasonable mind could support the challenged conclusion"). Therefore, review of an administrative decision by a Correction Board "is limited to determining whether the [Correction Board] action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced." *Clayton v. United States,* 225 Ct.Cl. 593, 595 (1980) (citing *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 810 (1979) *(en banc), superseded by statute as stated in Richey v. United States,* 322 F.3d 1317 (Fed.Cir.2003)). The plaintiff bears the burden of providing "cogent and clearly convincing evidence" that the Correction Board's action was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations. *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.1986) (quoting *Dorl v. United States,* 200 Ct.Cl. 626, 633, *cert. denied,* 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973)).

### III. DISCUSSION

#### A. Counts I, II, and III of Plaintiff's Amended Complaint

In Count I, entitled "Coerion [sic] Through Obstruction of Justice," plaintiff alleges,

9. In so holding, the Supreme Court determined that the "no set of facts" language set forth in *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), "has earned its retirement." *Bell Atl.,* 127 S.Ct. at 1969.

10. The decision in *Bannum* was based upon RCFC 56. 1, which was abrogated and replaced by RCFC 52.1. *See supra* note 8. However, RCFC 52.1 was designed to incorporate the decision in *Bannum. See* RCFC 52.1, Rules Committee Note (June 20, 2006).

among other things, that the Army "gained entrance and seized personal properties" from plaintiff's quarters, Am. Compl. ¶¶ 48–50; tampered with and falsified evidence, *id.* ¶¶ 29–30, 46–47, 50; harassed, intimidated, and coerced him into accepting NJP, *id.* ¶¶ 26, 28, 31, 51–52; and engaged in racial discrimination, *id.* ¶¶ 51, 53. In Count II, entitled "Article 15 Coercion Through Intimidation and Violation of Regulations," plaintiff alleges, among other things, that he was furnished ineffective assistance of counsel. *Id.* ¶¶ 57–59. Additionally, plaintiff claims that the Army coerced him into executing an agreement accepting NJP and involuntary retirement in lieu of trial by court-martial, *id.* ¶¶ 60–63; falsified evidence, violated regulations, and obstructed justice, *id.* ¶¶ 63–72; and caused plaintiff "severe emotional harm and damage through involuntary dismissal from the Army based upon unsupported charges," *id.* ¶ 72.

In Count III, entitled "Violation of Fifth Amendment–Due Process and Liberty Interest," plaintiff alleges that his bar to reenlistment was improper, *id.* ¶¶ 75, 77, and constituted double jeopardy absent due process, *id.* ¶ 85. Plaintiff claims that the Army engaged in illegal tortious conduct used to coerce plaintiff into accepting NJP. *Id.* ¶¶ 81, 86. Additionally, plaintiff alleges that the Army's issuance of illegal subpoenas injured plaintiff's reputation by causing plaintiff to suffer "stigma" beyond the military environment as well as other emotional harms, *id.* ¶¶ 87, 89–90, 93; violated plaintiff's liberty absent due process in violation of the Fifth Amendment, *id.* ¶ 90; and violated its own regulations and practices, *id.* ¶ 92.

### 1. Plaintiff's Tort Allegations

■ Plaintiff alleges that the Army engaged in specific criminal acts, including obstructing justice, *id.* ¶¶ 3–4, 7, 11–12, 14, 30, 39, 46–47, 50, 69 –70, 72, 81, 86, Wherefore ¶ 16; manufacturing, concealing, and tampering with evidence, *id.* ¶¶ 6–7, 11–13, 16–17, 30–33, 37, 46–50, 53, 58, 67–71, 81, 86, 88, 90–92, Wherefore ¶¶ 2, 16; coercing plaintiff into retirement, *id.* ¶¶ 3–5, 23, 25, 28, 31, 37, 39–40, 51–52, 62, 71, 81, 83, 86, 90; and subjecting plaintiff to double jeopardy absent due process, *id.* ¶ 85. Plaintiff also alleges that

the Army discriminated against him on the basis of race. *Id.* ¶¶ 20–21, 51, 53. As a result of the Army's alleged conduct, plaintiff claims that he suffered various forms of emotional distress. *Id.* ¶¶ 59, 72, 89, 93.

Insofar as plaintiff's amended complaint includes tort allegations, it must be dismissed as to those allegations because they fall outside the scope of the court's jurisdiction. The Court of Federal Claims "lacks jurisdiction over *any and every kind of tort claim.*" *Cottrell v. United States,* 42 Fed.Cl. 144, 149 (1998) (emphasis added); *see also Shearin v. United States,* 992 F.2d 1195, 1197 (Fed.Cir. 1993) (stating that it is "well settled that the United States Court of Federal Claims lacks ... jurisdiction to entertain tort claims"). The court lacks jurisdiction "over claims that defendant engaged in negligent, fraudulent, or other wrongful conduct when discharging its official duties.... Even where the claim is framed under non-tort law, the court lacks jurisdiction if the essence of the claim lies in tort." *Cottrell,* 42 Fed.Cl. at 149. Therefore, the court lacks jurisdiction over plaintiff's allegations that the Army engaged in criminal conduct. *Joshua v. United States,* 17 F.3d 378, 379 (Fed.Cir.1994) (stating that the Court of Federal Claims "has no jurisdiction to adjudicate any claims whatsoever under the federal criminal code"); *Matthews,* 72 Fed.Cl. at 282 (indicating same).

■ Although plaintiff alleges racial discrimination, Am. Compl. ¶¶ 3, 51, he does not cite a particular statute or provision upon which these allegations are based. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (2000), prohibits the government from engaging in discrimination, but it does not apply to military personnel. *Gonzalez v. Dep't of the Army,* 718 F.2d 926, 928–29 (9th Cir.1983); *Canonica v. United States,* 41 Fed.Cl. 516, 522–23 (1998). Even if Title VII applied to plaintiff, the United States district courts possess exclusive jurisdiction over race discrimination claims. *Cottrell,* 42 Fed.Cl. at 149. The court lacks jurisdiction to entertain an action brought under Title VII specifically, *Dixon v. United States,* 17 Cl.Ct. 73, 77 (1989), and lacks jurisdiction to adjudicate tort claims general-

ly. Accordingly, plaintiff's allegations of racial discrimination are dismissed.

■ Finally, plaintiff's allegations of emotional distress and anguish, which also sound in tort, fall outside the jurisdiction of the Court of Federal Claims. *Bolduc v. United States,* No. 06–5144, 2007 WL 2493677, at *3 (Fed.Cir. Sept.5, 2007) ("[T]he Court of Federal Claims has no jurisdiction over claims sounding in tort...."); *Curry v. United States,* 221 Ct.Cl. 741, 609 F.2d 980, 983 (1979) (declaring the torts of emotional distress and anguish as outside of the court's jurisdiction); *see also Pratt,* 50 Fed.Cl. at 482 ("The court lacks jurisdiction to award plaintiff's prayer for damages for emotional distress...."). Consequently, the court dismisses plaintiff's claims based upon emotional distress and anguish for lack of jurisdiction.

2. **Plaintiff's Fourth Amendment and Fifth Amendment Due Process and Double Jeopardy Clause Allegations**

■ The court cannot adjudicate plaintiff's allegations that his Fourth Amendment rights were violated by the Army's alleged "concealing and omitting evidence from the military judge" in order to obtain a search warrant.[11] Am. Compl. ¶¶ 47–48, 50; Pl.'s Resp. 4. The Fourth Amendment provides no right to money damages for its breach. U.S. Const. amend. IV; *LaChance v. United States,* 15 Cl.Ct. 127, 130 (1988) ("[T]he fourth amendment does not mandate the payment of money by the United States." (citing *Shaw v. United States,* 8 Cl.Ct. 796, 800 (1985))). Therefore, the court lacks jurisdiction over plaintiff's search and seizure claims. Similarly, the Court of Federal Claims lacks jurisdiction over plaintiff's due process and double jeopardy allegations as it is "well established that the Court of Federal Claims lacks jurisdiction over such claims because neither [the Due Process Clause nor the Double Jeopardy Clause of the Fifth Amendment] is a money-mandating provi-

sion." *James v. Caldera,* 159 F.3d 573, 581 (Fed.Cir.1998).

3. **Plaintiff's Military Pay Allegations**

Plaintiff argues that the Court of Federal Claims possesses jurisdiction over his military pay allegations because, "[a]s a former service member forced into involuntary retirement from the United States Army, plaintiff was entitled to his pay as 'a member of a uniformed service on active duty'" under the Military Pay Act, 37 U.S.C. § 204 (2000). Am. Compl. ¶ 10 (quoting 37 U.S.C. § 204(a)(1)); *see also* Pl.'s Mot. 38–39 (citing 37 U.S.C. § 204). Plaintiff claims that his discharge was unlawful because he was coerced into accepting NJP, which included "a fine of one half basic pay for two months, a letter of reprimand, and involuntary retirement," as well as a bar to reenlistment. Am. Compl. ¶¶ 31, 37. Plaintiff requests that the court "declare ... that he is granted military service of thirty years for retirement purposes, afforded and granted back pay, entitlement, and all benefits," *id.* Wherefore ¶ 4, and seeks "[p]ayment of monies that Plaintiff would have received from defendant had he not been involuntary [sic] retired from service with a 28 year active duty status from February 2000 through [the] present, reduced by the difference in retirement pay he actually received during that same period," *id.* Wherefore ¶ 5.

Defendant argues that plaintiff's military pay allegations fall outside the scope of section 204 and therefore do not confer jurisdiction upon the court. Def.'s Mot. 6–8. Section 204 does not apply, defendant maintains, because plaintiff does not present a claim for presently due money damages. *Id.* at 8. Alternatively, defendant seeks judgment on the administrative record with regard to these allegations in the event that the court does possess jurisdiction. *Id.* at 8–9 (noting that, because defendant "is relying upon evidence outside the pleadings," the court may not dismiss plaintiff's military pay claims pursuant to RCFC 12(b)(6)); Def.'s Reply 4.

11. In its reply brief, defendant asserts that plaintiff's cross-motion "for the first time raises a Fourth Amendment argument" and argues that the court should not consider this claim. Def.'s Reply 4 n. 6. Construing plaintiff's amended complaint liberally, *McSheffrey v. United States,* 58 Fed.Cl. 21, 25 (2003), the court does not believe that these Fourth Amendment allegations were newly raised in plaintiff's brief.

### a. The Court of Federal Claims Possesses Jurisdiction Over Plaintiff's Military Pay Allegations

■ It is "well established that claims for back pay stemming from allegedly unlawful separation from active duty in the armed services are within the jurisdiction of the Court of Federal Claims under 28 U.S.C. § 1491(a)." *Spehr v. United States,* 51 Fed. Cl. 69, 81 (2001). The Military Pay Act, which provides that a member of a uniformed service who is on active duty is "entitled to the basic pay of the pay grade to which [he is] assigned," 37 U.S.C. § 204(a), "serves as [a] basis for Tucker Act jurisdiction," *Holley v. United States,* 124 F.3d 1462, 1465 (Fed. Cir.1997); *see also Martinez v. United States,* 333 F.3d 1295, 1303 (Fed.Cir.2003) ("In the context of military discharge cases, the applicable 'money-mandating' statute that is generally invoked is ... 37 U.S.C. § 204."); *Martinez v. United States,* 77 Fed. Cl. 318, 322 (2007) ("For enlisted personnel, the money-mandating provisions of the Military Pay Act ... grant the United States Court of Federal Claims jurisdiction to adjudicate requests for reinstatement, back pay, or both."). In order to maintain a military discharge case in the Court of Federal Claims, a plaintiff "must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge." *Martinez,* 333 F.3d at 1303.

Some confusion developed in the case law with regard to whether the court's jurisdiction over military pay claims is dependent upon the voluntary or involuntary discharge of a plaintiff from one of the armed services. *See, e.g., Murphy v. United States,* 69 Fed. Cl. 593, 602 (2006) (noting that "[p]ronouncements in this area of law ... have been somewhat confusing"), *aff'd on other grounds,* 223 Fed.Appx. 966 (Fed.Cir.2007). In *Canonica,* the Court of Federal Claims found that it possessed subject matter jurisdiction where a plaintiff alleged that his retirement was involuntary coupled with violations of military regulations, statutes, and the Constitution. 41 Fed.Cl. at 520. Where a plaintiff's discharge, however, "was volun-

tary, he retained no statutory entitlement to compensation, and thus no money-mandating provision would support Tucker Act jurisdiction over his claim." *West v. United States,* 35 Fed.Cl. 226, 230 (1996) (citing *Adkins v. United States,* 68 F.3d 1317, 1321 (Fed.Cir. 1995)). Similarly, the Federal Circuit concluded that voluntary discharge divested the Court of Federal Claims of jurisdiction to review discharge or back pay claims. *See, e.g., Carmichael v. United States,* 298 F.3d 1367, 1371 (Fed.Cir.2002) ("If a discharge from service is voluntary, then the Court of Federal Claims lacks jurisdiction to review the discharge or any back pay damages claims."); *Adkins,* 68 F.3d at 1321 ("If ... [plaintiff's] retirement was 'voluntary,' he retained no statutory entitlement to compensation, and thus no money-mandating provision would support Tucker Act jurisdiction over his claim.").

In the *en banc* portion of *Fisher,* the Federal Circuit explained that whether the Court of Federal Claims possesses subject matter jurisdiction in a Tucker Act case constitutes a one-step inquiry:

When a complaint is filed alleging a Tucker Act claim based on a Constitutional provision, statute, or regulation, *see* 28 U.S.C. § 1491(a)(1), the trial court at the outset shall determine, either in response to a motion by the Government or *sua sponte* (the court is always responsible for its own jurisdiction), whether the Constitutional provision, statute, or regulation is one that is money-mandating.

If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall the proceed with the case in the normal course. For purposes of the case before the trial court, the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.

If the court's conclusion is that the source as alleged and pleaded is not mon-

ey-mandating, the court shall so declare, and shall dismiss the cause for lack of jurisdiction, a Rule 12(b)(1) dismissal—the absence of a money-mandating source being fatal to the court's jurisdiction under the Tucker Act.

*Fisher,* 402 F.3d at 1173 (*en banc* in part). Following *Fisher,* the court must first determine whether the source of substantive law is money-mandating for jurisdictional purposes and then proceed to consider whether the plaintiff's case falls within the scope of the source as part of its determination on the merits. *See In re United States,* 463 F.3d 1328, 1334–35 (Fed.Cir.2006). Thus, the issue of whether plaintiff's discharge was voluntary or involuntary is not jurisdictional but instead "should be considered in the context of the merits of a plaintiff's case in determining whether a plaintiff can take advantage of [section] 204's money-mandating status." *Metz v. United States,* 466 F.3d 991, 998 (Fed.Cir.2006); *see also id.* at 1000 ("[T]he issue of the voluntariness of a plaintiff's separation from service is no longer a jurisdictional concern; rather, it is a part of the merits of a case brought under the Military Pay Act."); *see also Canonica,* 41 Fed.Cl. at 520 ("[T]he issue whether or not plaintiff voluntarily retired is a merits issue, not a jurisdictional one.").

Based upon the foregoing discussion, the court possesses jurisdiction over those allegations contained in Counts I through III of plaintiff's amended complaint that are grounded in section 204 of the Military Pay Act. *See* Am. Compl. ¶¶ 52, 60–62, 75, 77; *see also Holley,* 124 F.3d at 1465 ("It is well established that 37 U.S.C. § 204 ... serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge."). The court's next inquiry is "whether the Military Pay Act could provide a monetary remedy under the circumstances of this case." *Smith v. Sec'y of the Army,* 384 F.3d 1288, 1294 (Fed.Cir.2004). As the court explains below, plaintiff fails to establish that the Military Pay Act could provide a monetary remedy in this case.

**b. Plaintiff's Allegations Fall Outside the Scope of Section 204 of the Military Pay Act**

Section 204 "'confers on an officer the right to the pay of the rank he was appointed to up until he is properly separated from the service.'" *Holley,* 124 F.3d at 1465 (quoting *Sanders,* 594 F.2d at 810). No serviceperson has a right to enlist or to reenlist in the armed forces "unless specially granted one...." *Dodson v. Dep't of the Army,* 988 F.2d 1199, 1208 (Fed.Cir.1993) (citing *Maier v. Orr,* 754 F.2d 973, 983 (Fed. Cir.1985)). Section 204 affords a plaintiff who was improperly or involuntarily released from active duty a right to back pay and allowances because a statutory right to compensation was not extinguished. *Brookins v. United States,* 75 Fed.Cl. 133, 139 (2007). An improperly discharged plaintiff "is entitled to recover pay and allowances only to the date on which his term of enlistment would otherwise have expired had he not been so discharged." *Dodson,* 988 F.2d at 1208 (citing *Maier,* 754 F.2d at 983). A plaintiff who "cannot establish that he is currently on active duty ... must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of [section] 204, or else his claim falls for failure to state a claim upon which relief can be granted." *Metz,* 466 F.3d at 998.

Plaintiff is no longer on active duty and claims that his separation from the Army was involuntary. Pl.'s Mot. 37 ("Plaintiff ... was forcefully retired on February 1, 2000."). Plaintiff alleges that his separation was involuntary because he "was barred from reenlistment, [was] issued Expiration of Term of Service (ETS) orders[,] and [was] ordered to leave the Army installation since [he was] no longer a servicemember." Am. Compl. ¶ 5. Plaintiff's bar from reenlistment is a separate issue from his claims under section 204 and is addressed below. The court's sole focus here is whether plaintiff's military pay claims fall within the scope of section 204.

Section 204 does not provide the appropriate mechanism for the relief plaintiff seeks. Jurisdiction in the Court of Federal Claims for back pay arises under section 204. *How-*

*ard–Pinson v. United States,* 74 Fed.Cl. 551, 553 (2006). Although plaintiff relies upon section 204 as grounds for seeking what he considers back pay, entitlement, and benefits, he is actually seeking "[p]ayment of monies that Plaintiff *would have received* had he not been involuntarily retired from service with a 28 year active duty status *from February 2000 through present* ...." Am. Compl. Wherefore ¶ 5 (emphasis added). Plaintiff appears to believe that he is entitled to thirty years of active service, *id.* Wherefore ¶ 4 (seeking military service of thirty years "for retirement purpose[s]"), and thus challenges his retirement from active service after twenty-eight years as involuntary, *id.* Wherefore ¶ 5.

■ Plaintiff, however, has neither a right to thirty years of active service nor a claim of entitlement for pay after January 31, 2000. A plaintiff "who seeks redress in the Court of Federal Claims must present a claim for 'actual, presently due money damages from the United States.'" *Terran v. Sec'y of HHS,* 195 F.3d 1302, 1309 (Fed.Cir.1999) (quoting *King,* 395 U.S. at 3, 89 S.Ct. 1501). The administrative record indicates that plaintiff does not have a claim for presently due money damages because the period during which plaintiff seeks "back pay," February 2000 onward, occurred after the expiration of plaintiff's term of enlistment.

As recounted above, plaintiff reenlisted in the Army for a period of two years on May 14, 1999, AR 1148–53, and that period expired on May 13, 1999, *id.* at 332; *see also* Am. Compl. ¶ 8. Plaintiff was permitted to remain on active duty past May 13, 1999, only because the Army's investigation of plaintiff remained pending. Am. Compl. ¶¶ 3–5; AR 327–28. That authorization was revoked on June 28, 1999, when the Army no longer possessed authority to retain plaintiff. AR 333, 469, 475. Plaintiff applied for and was granted voluntary retirement effective January 1, 2000, *id.* at 336–37, although that date was ultimately extended to January 31, 2000, *id.* at 538. Plaintiff was compensated up to and including his last day on active duty, which was January 31, 2000. AR Vol. IV at 28–29.

Section 204 does not confer upon plaintiff a right to receive pay for any period after January 31, 2000, because he was no longer serving in the Army after that date. *See Thomas v. United States,* 42 Fed.Cl. 449, 452 (1998) ("[C]laims for post-retirement relief following a voluntary retirement must be denied for failure to state a claim upon which any court can grant relief."). Once a plaintiff's term of enlistment has expired, a plaintiff is no longer entitled to pay under section 204. *James,* 159 F.3d at 581; *see also Testan,* 424 U.S. at 402, 96 S.Ct. 948 ("The established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it."); *Maier,* 754 F.2d at 980 ("No one has an individual right, constitutional or otherwise, to enlist in the armed forces...."). Unless a statute or regulation confers upon a serviceperson the right to reenlist, "an enlisted man has no right to reenlist when his previous enlistment period ends...." *McEniry v. United States,* 7 Cl. Ct. 622, 626 (1985) (citing *Thompson v. United States,* 221 Ct.Cl. 983, 983–84, 1979 WL 10425 (1979)); *see also Austin v. United States,* 206 Ct.Cl. 719, 723, 1975 WL 22844 (1975) (stating that the United States Court of Claims has "consistently held that since ... servicemen have no right to reenlist at the expiration of their current enlistments, the United States has undertaken to pay them only to the end of the current enlistment, unless it properly discharges them prior to that time" (citing *Rowe v. United States,* 167 Ct.Cl. 468, 470–72 (1964), *cert. denied,* 380 U.S. 961, 85 S.Ct. 1103, 14 L.Ed.2d 152 (1965))), *cert. denied,* 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975); *Hernandez v. United States,* 38 Fed.Cl. 532, 536–37 (1997) ("[L]acking a legal right to reenlist, it follows that plaintiff's right to pay terminated at the expiration of his enlistment period." (citing *Austin,* 206 Ct.Cl. at 723)). Absent statutory or regulatory authority granting plaintiff a right to reenlist, plaintiff cannot claim that he is entitled to any future military pay in order to achieve thirty years of active military service. *Schrader v. United States,* 20 Cl.Ct. 161, 163 (1990) ("The plaintiff has no vested right in military pay to be earned in the future....").

Plaintiff acknowledges that he was "outside the reenlistment window and . . . reenlistment required Department of the Army approval," Am. Compl. ¶ 75, but he fails to cite any statutory authority conferring upon him a right to reenlist. To the extent that plaintiff relies upon 10 U.S.C. § 3914 (2000), *see* Am. Compl. ¶ B; Pl.'s Mot. 39–40, such reliance is misplaced. Section 3914 provides that, "[u]nder regulations to be prescribed by the Secretary of the Army, an enlisted member of the Army who has at least 20, but less than 30, years of service computed under section 3925 of this title may, upon his request, be retired." 10 U.S.C. § 3914. Section 3914 only affords plaintiff, who accumulated at least twenty but no greater than thirty years of service, a right to retire. It does not confer upon him a right to reenlist or to receive compensation beyond either May 13, 1999, the expiration date of his enlistment, or June 28, 1999, the date on which the Army revoked its authorization to extend plaintiff's expiration of his term of service.

Plaintiff also fails to cite any regulative authority granting him a right to reenlist. To the extent that plaintiff relies upon Army Regulation 635–200 to argue that the Army extended his enlistment, Am. Compl. ¶ F, plaintiff would have only been entitled to military pay through January 31, 2000. "If [plaintiff] was wrongfully discharged before the end of his extended term of enlistment, his right to pay continued. . . ." *James*, 159 F.3d at 582. Plaintiff, however, does not allege that he was denied military pay prior to the expiration of his term of enlistment on May 13, 1999, or revocation of the Army's extension of plaintiff's expiration of his term of service on June 28, 1999. In fact, plaintiff never alleges that he was discharged from the Army prior to either May 13, 1999, or June 28, 1999. *See McEniry*, 7 Cl.Ct. at 626 (determining that, where plaintiff neither alleged removal from active service prior to the termination of an enlistment period nor denial of any pay or allowances from that

period, the court lacked subject matter jurisdiction to consider a claim for military pay). Moreover, plaintiff does not allege that he was denied military pay through January 31, 2000, his last day on active duty. Consequently, plaintiff demonstrates no entitlement to military pay under section 204.

Lastly, plaintiff's allegations that his retirement was involuntary are unsubstantiated. Although section 204 "requires that a plaintiff's separation be involuntary," *Metz*, 466 F.3d at 999, plaintiff appears to suggest that his retirement was involuntary because he was not permitted to attain thirty years of active duty service. Plaintiff, however, cannot maintain that his retirement on January 31, 2000—occurring after both the expiration of his enlistment term on May 13, 1999, and revocation of an extension of plaintiff's expiration of his term of service on June 28, 1999—was involuntary because he was not permitted to serve thirty years on active duty. As discussed above, plaintiff had no right to reenlist following the expiration of his enlistment term.

As the administrative record makes clear, plaintiff, lacking any right to reenlist after the expiration of his term of enlistment, was afforded two options: he could either apply for voluntary retirement or accept discharge for expiration of term of service.[12] AR 387. A decision to retire is presumed to be voluntary. *Carmichael*, 298 F.3d at 1372 ("A presumption of voluntariness generally exists where an employee . . . retires. . . . This presumption of voluntariness logically should extend to a military service member's honorable discharge upon the expiration of the terms of his enlistment. . . ."). Additionally, a "voluntary decision to retire . . . is not rendered involuntary simply because the service member faced a difficult situation in which his choice was limited to one of two unpleasant alternatives." *Murphy*, 69 Fed. Cl. at 605 (citing *Schultz v. U.S. Navy*, 810 F.2d 1133, 1136–37 (Fed.Cir.1987)).

---

12. Discharge for expiration of term of service would constitute a discharge without retirement. AR 387. According to a letter from Lieutenant Colonel John L. Charvat, Jr. to plaintiff's civilian counsel dated July 19, 1999, a retired soldier receives a "substantial" benefits package, including retired pay, a survivor benefit plan, medical and dental care, and access to on-post services. *Id.* A retired soldier's pay "is equivalent to a pension [and] continues for life." *Id.*

Plaintiff, however, can rebut a presumption of voluntariness if he can "demonstrate that (1)[he] resigned or retired under duress or coercion caused by the government; or (2) the government misrepresented information and that [he] detrimentally relied upon such information." *Kim v. United States*, 47 Fed.Cl. 493, 497 (2000). Here, plaintiff alleges that he was coerced into accepting NJP. Am. Compl. ¶ 52. In order to prove duress or coercion, plaintiff must show that the Army imposed the terms of his retirement, plaintiff's circumstances permitted no alternative but to accept those terms, and circumstances were the result of the Army's improper acts. *Schultz*, 810 F.2d at 1136; *Christie v. United States*, 207 Ct.Cl. 333, 518 F.2d 584, 587 (1975).

The court concludes that plaintiff's retirement was voluntary and that plaintiff has failed to rebut the presumption of voluntariness on account of duress or coercion. First, plaintiff knowingly and voluntarily entered into a plea bargain memorialized in the August 22 agreement, wherein he accepted NJP and agreed to apply for retirement in exchange for dismissal of all charges against him. Second, plaintiff had an opportunity to consult with counsel prior to entering into the August 22 agreement. Third, plaintiff was furnished at least one alternative to voluntary retirement with benefits: discharge for expiration of term of service. Both of these options were more favorable than facing trial by court-martial, and neither can be considered unpleasant under the circumstances. Fourth, plaintiff participated in setting the terms of his retirement when, on at least two occasions, he requested modification to the date upon which his retirement would become effective. Lastly, notwithstanding various allegations that his retirement was involuntary, Am. Compl. ¶¶ 31, 37, 39, 51, 62, 72, 77, plaintiff simply does not prove that any separation, whether voluntary or involuntary, occurred prior to either the expiration of his term of service on May 13, 1999, or the Army's revocation of its extension to plaintiff's expiration of his term of service on June 28, 1999.

Because plaintiff does not allege that his service ended prior to either May 13, 1999, or June 28, 1999, his claims are distinguishable from those cases in which an enlistee claimed an improper discharge prior to the end of the then-current enlistment period. *E.g.*, *McEniry*, 7 Cl.Ct. at 625 (citing *Austin*, 206 Ct. Cl. at 723–24). Instead, plaintiff separated from the Army after completion of his full enlistment term and received military pay through and including January 31, 2000. Alternatively, even were plaintiff to prove that his retirement was involuntary, he would be "entitled to recover pay and allowances *only to the date on which his term of enlistment would otherwise have expired had he not been so discharged.*" *Dodson*, 988 F.2d at 1208 (emphasis added). Since plaintiff already received pay and allowances through January 31, 2000, the court holds that plaintiff cannot claim entitlement to military pay under section 204.

### 4. Plaintiff's Ineffective Assistance of Counsel Allegations

Linked to plaintiff's military pay claims is plaintiff's allegation that his separation was involuntary because he received ineffective assistance of counsel. Am. Compl. ¶¶ 3, 57–59, 81. Specifically, plaintiff claims that military counsel "failed to properly investigate the case," *id.* ¶ 57, allegedly "caused unknown persons to enter Plaintiff's automobile and remove a document from [his] files," *id.* ¶ 58, and that "due to inadequate and ineffective legal assistance ... Plaintiff was ... ultimately coerced retirement [sic]," *id.* ¶ 3. Plaintiff also maintains that his military counsel's departure from his case in July 1998 "left plaintiff vulnerable to deception and more harassment." Pl.'s Mot. 50. Additionally, plaintiff argues that new military counsel engaged in misrepresentations and "deceit." *Id.* at 51. As discussed below, plaintiff fails to prove that he was furnished deficient counsel.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the following standard:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This required showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

This standard is "no different in military proceedings than in other federal courts...." *Longval v. United States*, 41 Fed.Cl. 291, 296 (1998) (citing *Allen v. VanCantfort*, 316 F.Supp. 222, 230 & n. 10 (D.Me. 1970), *aff'd*, 436 F.2d 625 (1st Cir.), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2189, 29 L.Ed.2d 430 (1971)).

The court has previously considered whether, during court-martial proceedings, a serviceperson has received ineffective assistance of counsel in connection with military pay claims. *See, e.g., Scarseth v. United States*, 52 Fed.Cl. 458, 469–73 (2002) (analyzing plaintiff's ineffective assistance of counsel claims in connection with allegations that the plaintiff was coerced to resign from the Army Reserve); *Longval*, 41 Fed.Cl. at 294–95 (acknowledging that a plaintiff may seek a limited collateral attack of a court-martial conviction on constitutional grounds if the underlying action falls within the court's jurisdiction). The Federal Circuit has cautioned, however, that constitutional claims arising from court-martial proceedings "must demonstrate convincingly that in the court-martial proceedings there has been such a deprivation of fundamental fairness as to impair due process." *Bowling v. United States*, 713 F.2d 1558, 1561 (Fed.Cir.1983).

In this case, no court-martial proceeding occurred because plaintiff entered into an agreement, which was tantamount to a plea agreement, with the Army, thereby disposing of all charges against him. Plaintiff accepted NJP pursuant to Article 15, AR 830–32, but claims that NJP was imposed upon him as a result of his counsel's "coercive actions that included threats, harassment, dispensing of insensitive remarks, and degradation," Pl.'s Mot. 24. In *Moody v. United States*, 58 Fed.Cl. 522 (2003), where the plaintiff, a former captain in the United States Marine Corps, "executed a pretrial agreement, essentially a plea bargain," *id.* at 523, the Honorable Francis M. Allegra noted:

Imagine, for a moment, an individual facing serious charges that could result in his being imprisoned for a lengthy period—according to defendant, up to 46 years. Then, flash forward to that same person no longer facing charges, with an honorable discharge and ... severance benefits in hand.... Judging from results, then, there is no indication that ... the performance of plaintiff's counsel here was remotely outside the range of professionally competent assistance, let alone prejudicial. Indeed, while courts have rejected the notion that lack of success is indicative of ineffective assistance, the reverse cannot be gainsaid—a relatively successful result suggests reasonably competent representation.

58 Fed.Cl. at 525–26 (citations omitted). In *Moody*, Judge Allegra concluded that plaintiff failed to allege, "let alone prove, facts that would lead this court to conclude that the assistance he received was tainted by the sort of serious errors that would vitiate the voluntariness of his resignation." *Id.* at 526.

The same may be said in this case. As the administrative record demonstrates, plaintiff's counsel presented to plaintiff the consequences of proceeding to trial by court-martial as well as the benefits of accepting NJP pursuant to Article 15. AR 709–10. According to his military counsel, plaintiff initially faced the prospect of "a dishonorable discharge, reduction to the lowest enlisted grade, confinement for up to 183 years, and a fine" if convicted. *Id.* But see Pl.'s Mot. 53 (arguing that, "the maximum punishment for a conviction of larceny of '[m]ilitary property of a value of more than $100.00 is a [d]ishonorable discharge, forfeiture of all pay and allowances, and confinement for 10 years'" (quoting *Manual for Courts–Martial United*

*States* ¶ 46e(1)(c) (1998 ed.))). In a memorandum to plaintiff dated August 17, 1998, plaintiff's military counsel presented the following recommendation:

> I can find no reason for you to demand trial by court-martial in this case. *As your legal advisor, I genuinely believe that your decision to demand trial by court-martial in this case is irresponsible and totally unsound. It will assuredly spell disaster for you, your wife, and your children.* You are risking so much of your family's future, and you cannot hope to achieve a better result than your article 15 offer. I urge you to reconsider and accept the article 15 offered to you in this case.

AR 710 (emphasis added). Rather than face court-martial proceedings, plaintiff entered into the August 22 agreement, wherein he acknowledged consultation with military and civilian counsel before executing that agreement. *Id.* at 738. Under the terms of the August 22 agreement, plaintiff accepted NJP, was not tried by court-martial, received an admonishment as his "maximum penalty," forfeited one-half of one month's pay for two months, was honorably discharged, and retired "with the rank and privileges of a Sergeant–Major with 28 years of experience." *Id.* at 709–10. Under these circumstances, it is apparent that plaintiff's military counsel achieved a highly desirable result such that plaintiff could retire with benefits and would not have a federal conviction, *see Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (requiring that "scrutiny of counsel's performance must be highly deferential"), and plaintiff neither sets forth any specific allegation nor provides any facts substantiating that military counsel's performance was deficient and prejudicial with respect to plaintiff's decision to accept NJP.

Additionally, with respect to plaintiff's allegations that his military counsel provided ineffective assistance "[p]rior to the Article 32 hearing," Am. Compl. ¶ 57, plaintiff similarly fails to prove that counsel's performance was both deficient and prejudicial. Plaintiff alleges that his military counsel "failed to properly investigate" his case, *id.,* and removed a document from his files, *id.* ¶ 58, but does not demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed" under the Sixth Amendment and that those errors deprived him of a fair hearing during the Article 32 hearing, *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *see also* AR 227 (noting that plaintiff was represented by military and civilian counsel during the Article 32 hearing). As a result, plaintiff has failed to set forth any facts that suggest that he was furnished ineffective assistance of counsel.

### 5. Plaintiff's Request for Correction of Military Records

Plaintiff requests that this court correct various portions of his military records. Am. Compl. Wherefore ¶ 3 (requesting that the "Article 15 be expunged and all references stricken from the record"); *id.* Wherefore ¶ 6 (seeking deletion of "all references of derogatory information to include the reviewer's non-concurrence dated September 16, 1998"); *id.* Wherefore ¶ 8 (requesting "[e]xpurgation of all references to Plaintiff['s] separation in lieu of court-martial from his records"); *id.* Wherefore ¶ 9 (seeking correction of the Army's "annual congressional report (CY 2002) submitted to the U.S. Congress that incorrectly states that Plaintiff retired in lieu of court martial"); *id.* Wherefore ¶ 16 (seeking declaration that the decision to deny plaintiff's request to correct his military records by the Corrections Board "was arbitrary, capricious, and unsupported by substantial evidence"). As stated above, judicial review of Correction Board decisions is limited, and a decision may only be set aside if it was arbitrary, capricious, contrary to law, or unsupported by substantial evidence. *Wronke,* 787 F.2d at 1576 (citing *Heisig,* 719 F.2d at 1156). Plaintiff must prove "by clear and convincing evidence that the board acted 'in bad faith, without a rational basis, or contrary to law, by which plaintiff has been seriously prejudiced and money is due.'" *Brown v. United States,* 30 Fed.Cl. 227, 231 (1993) (quoting *Arens v. United States,* 24 Cl.Ct. 407, 415 (1991), *vacated on other grounds,* 969 F.2d 1034 (Fed. Cir.1992)).

The Court of Federal Claims lacks the power to grant general equitable relief. *Doe*

*v. United States,* 372 F.3d 1308, 1313 (Fed. Cir.2004). The Tucker Act, however, enables the court to grant equitable relief under limited circumstances. It states that,

> [t]o provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.

28 U.S.C. § 1491(a)(2). The court, therefore, may correct applicable records only "as an incident of and collateral to" a judgment against the United States for money damages. *Id.; see also James,* 159 F.3d at 580 ("Stated another way, the Court of Federal Claims has no power 'to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment.'" (quoting *Austin,* 206 Ct.Cl. at 723)). Where no money damages are owed by defendant to plaintiff, equitable relief does not attach. *Phillips v. United States,* 77 Fed.Cl. 513, 520 (2007).

As the court determined above, plaintiff is entitled to no monetary judgment for military pay. He was not separated from the Army prior to the expiration of his term of service on May 13, 1999, and he was never denied compensation while on active duty. Plaintiff lacked authorization to reenlist after May 13, 1999, had no right to reenlist for another term in order to attain thirty years of active duty service, and is not entitled to any military pay following his retirement from the Army on January 31, 2000. Without an ability to award plaintiff money damages, the court is unable to "complete the relief afforded by the judgment" by correcting his military records because such equitable relief is not "an incident of and collateral to" a monetary award. 28 U.S.C. § 1491(a)(2).

Alternatively, assuming, *arguendo,* that the court had the ability to correct plaintiff's military records "as an incident of and collateral to" a judgment against defendant for money damages in this case, *id.,* it would be unable to do so. In denying plaintiff's petition, the Correction Board reiterated that "there was no error or injustice in the imposition of the applicant's NJP." AR 7. Plaintiff, it concluded, "has not submitted any evidence which shows fraud, mistake of law, mathematical miscalculation, manifest error; nor did he submit any substantial relevant new evidence...." *Id.* at 6. Furthermore, the Correction Board determined that "[i]t must be presumed that a soldier of the applicant's rank and years of service consciously, after consulting with legal counsel, made the decision to accept NJP and to submit his retirement instead of demanding trial by court-martial." *Id.* at 7. To the extent that plaintiff's complaint in this court challenges the merits of the Army's decisions, those decisions are "committed wholly to the discretion of the military [and] are not subject to judicial review...." *Adkins,* 68 F.3d at 1323. As to plaintiff's challenges to the particular procedures followed by the Army, the court concludes that plaintiff has failed to demonstrate that the Army's alleged conduct constitutes a "deprivation of fundamental fairness as to impair due process." *Bowling,* 713 F.2d at 1561. "The arbitrary and capricious standard of review is difficult for an appellant to satisfy," *Lampe v. Sec'y of HHS,* 219 F.3d 1357, 1360 (Fed.Cir.2000), and plaintiff has not satisfied this "heavy burden," *Womack v. United States,* 34 Fed.Cl. 755, 761 (1996), by presenting clear and convincing evidence that the Correction Board's decision was made in bad faith, lacked a rational basis, or was contrary to law, *Brown,* 30 Fed.Cl. at 231. As the administrative record indicates, the Correction Board explained its decision based upon the evidence before it, that decision was based upon substantial evidence, and plaintiff has failed to demonstrate otherwise.

### 6. Plaintiff's Bar to Reenlistment Allegations

The previously discussed decision in *McEniry* is, once again, instructive. With regard to a reenlistment claim, the court's characterization of the complaint at issue in that case aptly describes plaintiff's complaint here: it "is essentially requesting the court to act affirmatively to order defendant to permit plaintiff's reenlistment." *McEniry,* 7

Cl.Ct. at 626; *see also* Am. Compl. Wherefore ¶ 1 (requesting that the court "[r]emove the Bar to Reenlistment"). Throughout his amended complaint, plaintiff alleges that the Army improperly imposed upon him a bar to reenlistment. *See* Am. Compl. ¶¶ 4–5, 8, 37–39, 75, 77–80, 82–85, 88, 90. In addition to seeking payment of monies for the period of time postdating February 2000, plaintiff requests that this court order defendant to furnish "[p]ayment of monies that Plaintiff would have received ... had he not been involuntary [sic] retired from service with a 28 year active duty status from February 2000 through present...." *Id.* Wherefore ¶ 5.

A claim for reinstatement is a claim for equitable relief. *James,* 159 F.3d at 580; *see also McEniry,* 7 Cl.Ct. at 626 (noting that requests for reenlistment are nonmonetary in nature). As stated above, equitable relief must be "an incident of and collateral to" a money judgment, 28 U.S.C. § 1491(a)(2), and "the Court of Federal Claims has no power 'to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment.'" *James,* 159 F.3d at 580 (quoting *Austin,* 206 Ct.Cl. at 723). Unable to claim a money judgment against the government, plaintiff is not entitled to equitable relief.

Assuming, *arguendo,* that plaintiff did assert a cognizable claim under section 204, the issue of plaintiff's bar to reenlistment is "entirely unrelated to [a] back pay issue." *Id.* at 581. Thus, review of plaintiff's bar to reenlistment is wholly distinct from the question of whether plaintiff involuntarily retired from or was deprived pay during his enlistment period in the Army. *See Voge v. United States,* 844 F.2d 776, 781–82 (Fed.Cir.) (vacating the portion of a court order reviewing servicewoman's service records because correction of service records was not "incident of and collateral to" an award of additional special pay), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988); *see also Carman v. United States,* 221 Ct.Cl. 165, 602 F.2d 946, 949 (1979) (holding that there must be a "sufficient nexus" between the money and the equitable claim for the Claims Court to consider an equitable claim). Consequent-

ly, the court cannot consider plaintiff's claim for reenlistment after May 13, 1999, as it lacks jurisdiction.

### 7. Plaintiff's Fifth Amendment Liberty Interest Allegations

In Count III of plaintiff's amended complaint, entitled "Violation of Fifth Amendment–Due Process and Liberty Interest," plaintiff may be asserting, in addition to Fifth Amendment due process allegations, *see supra* Part III.A.2, a claim that the Army violated his Fifth Amendment liberty interest in his employment. A liberty interest under the Due Process Clause "is implicated when the employer puts a person's good name, reputation, honor, or integrity at stake." *Fiorentino v. United States,* 221 Ct.Cl. 545, 607 F.2d 963, 969 (1979); *see also Bd. of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (" '[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' " (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971))).

 Although "an enlisted member of the armed forces does not have a property interest in his employment because he may be discharged 'as prescribed by the Secretary' of his service," *Canonica,* 41 Fed.Cl. at 524 (quoting 10 U.S.C. § 1169 (1994)), "courts have held that an enlisted member of the armed forces has a liberty interest in his employment." *Id.* "In order to satisfy his threshold burden to state a claim for deprivation of a constitutionally protected liberty interest, plaintiff must show that in the course of his discharge, the military, without notice and an opportunity to be heard, prepared a discharge form which was (1) stigmatizing, (2) false, and (3) published." *Lee v. United States,* 32 Fed.Cl. 530, 546 n. 17 (1995) (citations omitted).

 In this case, plaintiff alleges that the Army "permanently stigmatized [his] reputation and imparted a 'status change' upon him," Am. Compl. ¶ 89, by, among other things, "compiling and disseminating inaccurate, derogatory information about [him] ...

that led to [his] bar to reenlistment and involuntary retirement," *id.* ¶ 90. The Army may not discharge plaintiff "without due process—but only in cases where a 'stigma' would attach to the discharge." *Canonica,* 41 Fed.Cl. at 524; *see also Holley,* 124 F.3d at 1470 ("We entirely agree that stigma can not be imposed by government without due process of law."). Liberty interests "are involved only when separation from the military is carried out in such fashion as to stigmatize the separated member, typically by dishonorable discharge." *Kinney v. United States,* 51 Fed.Cl. 126, 130 (2001); *see also Sutton v. United States,* 65 Fed.Cl. 800, 806 (2005) ("Due process protects a government employee's liberty interest in employment when the government publicizes stigmatizing information, which is 'based upon an unsupported charge, which could wrongfully injure the reputation of an employee.'" (quoting *Alberico v. United States,* 7 Cl.Ct. 165, 169 (1984))).

Notwithstanding his allegations, plaintiff fails to demonstrate that the Army, *"in the course of his discharge* ... prepared a discharge form which was ... stigmatizing...." *Lee,* 32 Fed.Cl. at 546 n. 17 (citation omitted) (emphasis added). Stigma exists where a discharge certificate reflects derogatory circumstances. *Weaver v. United States,* 46 Fed.Cl. 69, 77 (2000) (citing *Keef v. United States,* 185 Ct.Cl. 454, 467–69 (1968)). Plaintiff's discharge papers contain no derogatory information, AR 1154–57, and plaintiff does not allege that his discharge was other than honorable. Rather, plaintiff's allegations of stigma relate to actions involving the issuance of a subpoena to obtain plaintiff's financial information, not to his discharge from the Army. Am. Compl. ¶¶ 87, 89, 90.

Additionally, "due process rights are typically fulfilled by notice of the government act and an opportunity to respond before or after the act." *Canonica,* 41 Fed.Cl. at 524. In this case, plaintiff knowingly and voluntarily accepted NJP under Article 15 and agreed to retire in exchange for withdrawal of all charges against him. Plaintiff subsequently filed an Article 15 appeal, which was denied. AR 591, 832. Plaintiff then received notice that the Army imposed a bar to plaintiff's reenlistment, and plaintiff appealed, albeit unsuccessfully.[13] *Id.* at 858–68. Plaintiff therefore cannot maintain either that he was deprived of an opportunity to be heard or that his separation from the Army was "carried out in such fashion as to stigmatize" him. *Kinney,* 51 Fed.Cl. at 130. Because no stigma attached to plaintiff's retirement and honorable discharge from the Army, the court need not examine the remaining two elements required to establish a claim for deprivation of a constitutionally protected liberty interest. *See Lee,* 32 Fed.Cl. at 546 n. 17. Thus, plaintiff's Fifth Amendment liberty interest claim is dismissed for failure to state a claim upon which relief can be granted.

### B. Count IV of Plaintiff's Amended Complaint[14]

In Count IV of plaintiff's amended complaint, entitled "Violation of Fifth Amendment by the Army Seizure of United [States] Saving[s] Bonds," plaintiff alleges that military personnel, "without Plaintiff's permission[,] removed and carried away Plaintiff's suitcase[, which] included personal clothing, a passport[,] and over $23,000 in U.S. Saving[s] Bonds" during a military flight departing from San Diego and arriving in South Carolina. Am. Compl. ¶¶ 103–04; *see also id.* ¶ 107 (accusing Captain John Ohlweiler of "orchestrat[ing] removal of the suitcase that included U.S. Saving[s] Bonds and personal items"); *id.* ¶ 108 ("The Army's illegal taking and depriving Plaintiff of ... U.S. Saving[s] Bonds violated Plaintiff's Fifth Amendment protection...."). Plaintiff seeks a declaration from the court (1) confirming that he is the lawful owner of the savings bonds, *id.* Wherefore ¶ 11; (2) determining that the Army's alleged seizure of the savings bonds "w[as] illegal and in violation of the Fifth Amendment," *id.* Wherefore ¶ 10; and (3) ordering the Secre-

---

13. A bar to reenlistment "is not necessarily a mark of discredit or disgrace ... [and] the mere fact that he cannot reenlist is not a stigma." *Keef,* 185 Ct.Cl. at 469.

14. Plaintiff did not address the takings claim contained in Count IV of the amended complaint in his opposition to defendant's motion to dismiss.

tary of the Treasury to reissue the savings bonds in plaintiff's name, *id.* Wherefore ¶ 14.

The court previously addressed plaintiff's savings bond allegations in the context of plaintiff's discovery motion and defendant's motion for summary judgment on plaintiff's breach of contract allegations regarding the savings bonds contained in Count V of plaintiff's amended complaint. *See Flowers,* 75 Fed.Cl. at 628–32. It denied plaintiff's request for discovery regarding the savings bonds allegedly stolen from his possession because plaintiff was not the registered owner of the savings bonds, was not in privity with the government, and therefore lacked standing to maintain an action for money damages for the alleged loss of the savings bonds. *Id.* at 631–32 ("[N]o information obtained through discovery would raise a dispute over material facts necessary to rebut defendant's assertion that plaintiff lacks standing."). The court concluded that, with the exception of a savings bond valued in excess of $10,000, plaintiff was collaterally estopped from litigating his savings bond claims that were previously litigated before the United States District Court for the District of Hawaii. *Id.* at 632. Additionally, plaintiff lacked standing to pursue an action related to the savings bond valued in excess of $10,000 in the Court of Federal Claims because plaintiff was not the registered owner of the savings bond. *Id.; see also id.* at 629–30 (stating that plaintiff's daughter was the registered owner of the $10,000 savings bond and that, pursuant to 31 C.F.R. § 353.5(a) (2005), "registration is conclusive of ownership").

It is well-settled that only the owner of the property on the date of a taking may bring a taking claim in this court. *See, e.g., Cienega Gardens v. United States,* 331 F.3d 1319, 1328 (Fed.Cir.2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken...."); *Cavin v. United States,* 956 F.2d 1131, 1134 (Fed.Cir.1992) ("Without undisputed ownership of the ... property at the time of the takings, [plaintiff] cannot maintain a suit alleging that the Government took [his] prop-

erty without just compensation."); *Consol. Edison Co. of N.Y., Inc. v. United States,* 67 Fed.Cl. 285, 291 n. 5 (2005) ("[O]nly the owner of property may sue for a taking of that property."). Having already determined that plaintiff is not the owner of the savings bond valued in excess of $10,000, plaintiff fails to establish a "specific property interest that plaintiff contends has been taken by the United States." RCFC 9(h)(7). Therefore, plaintiff has not satisfied his initial burden of demonstrating that he holds a property interest in the savings bond. *See Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir.1993) ("[P]laintiff must show a legally-cognizable property interest.").

Additionally, the Tucker Act "does not create jurisdiction in the Court of Federal Claims for a party contesting the propriety of a taking." *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997) (citing *Fla. Rock Indus., Inc. v. United States,* 791 F.2d 893, 898–99 (Fed.Cir.1986)); *accord Zoltek Corp. v. United States,* 58 Fed.Cl. 688, 696 (2003). Thus, "[a]n assertion that the Government's action is unlawful is insufficient to allege a taking that vests jurisdiction in this court because '[c]hallenges to the propriety of government action sound in tort.'" *B & F Trawlers, Inc. v. United States,* 27 Fed.Cl. 299, 303 (1992) (quoting *Montego Bay Imps., Ltd. v. United States,* 10 Cl.Ct. 806, 809 (1986)) (alteration in original). The court therefore dismisses Count IV of plaintiff's amended complaint for lack of jurisdiction.

## C. Plaintiff's Request for Transfer Pursuant to 28 U.S.C. § 1631

█ Plaintiff requests that, "[i]f this Court should determine it lacks jurisdiction on any or part of the claims as an alternative, ... jurisdiction be transferred to the appropriate United States District Court pursuant to 28 U.S.C. § 1631." Pl.'s Mot. 74. "When a court lacks jurisdiction, the ordinary course is ... to dismiss...." *Phillips v. Seiter,* 173 F.3d 609, 610 (7th Cir.1999). The federal transfer statute, 28 U.S.C. § 1631 (2000), enables a court to transfer a claim over which it lacks jurisdiction to a court where it could have been brought. *Phillips,* 77 Fed.Cl. at 521. It provides:

Whenever a civil action is filed in a court as defined in section 610 of this title ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action ... to any other such court in which the action ... could have been brought.[15]

28 U.S.C. § 1631 (footnote added). The court may transfer the case even in the absence of a request by one of the parties. *Phillips,* 173 F.3d at 610. The court notes that plaintiff has not identified any court where his action "could have been brought." 28 U.S.C. § 1631.

Section 1631 "requires the transferor court to determine both that it lacks jurisdiction and that the transferee court possesses jurisdiction." *Fisherman's Harvest, Inc. v. PBS & J,* 490 F.3d 1371, 1374 (Fed.Cir.2007). Plaintiff's tort claims implicate the doctrine of intramilitary immunity articulated by the Supreme Court in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). It is "long established that intramilitary suits seeking damages against the United States based on tort are precluded under the *Feres* doctrine." *Diaz–Romero v. Ashcroft,* 472 F.Supp.2d 156, 163 (D.P.R.2007). In *Feres,* the Supreme Court precluded military personnel from asserting negligence claims against the government for injuries "aris[ing] out of or ... in the course of activity incident to service" under the Federal Tort Claims Act. 340 U.S. at 146, 71 S.Ct. 153. "That holding of *Feres* was later extended beyond the Tort Claims Act to recognize the 'unique relationship between the government and military personnel,' and the disruption to that relationship that could result if a 'soldier were allowed to hale his superiors into court.'" *Jentoft,* 450 F.3d at 1349 (quoting *Chappell v. Wallace,* 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983)). The *Feres* doctrine bars intentional tort claims as well as simple negligence claims. *Mollnow v. Carlton,* 716 F.2d 627, 628 (9th Cir.1983); *see also Heilman v. United States,* 731 F.2d 1104, 1112 (3d Cir.1984) ("Courts have construed *Feres* to preclude claims of negligent conduct by individual government officials, [and] intentional or constitutional torts by individuals and by the United States...."). In *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), the Supreme Court stated that

> *Feres* seems best explained by the 'peculiar and special relationship of the solider to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits ... were allowed for negligent orders given or negligent acts committed in the course of military duty....'

*Id.* at 162, 83 S.Ct. at 1858 (quoting *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954)). Thus, it has been stated that "practically any suit that 'implicates the military judgments and decisions' runs the risk of colliding with Feres." *Persons v. United States,* 925 F.2d 292, 295 (9th Cir.1991) (quoting *United States v. Johnson,* 481 U.S. 681, 691, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987)) (citation omitted); *see also Hodge v. Dalton,* 107 F.3d 705, 710 (9th Cir.1997) (noting that the *Feres* doctrine applies "whenever a legal action 'would require a civilian court to examine decisions regarding management, discipline, supervision, and control of members of the armed forces of the United States'" (quoting *McGowan v. Scoggins,* 890 F.2d 128, 132 (9th Cir.1989))).

The primary question is whether plaintiff's tort claims are transferable to another forum or are barred by the *Feres* doctrine because they "arise out of or ... [are] in the course of activity incident to [military] service." *Feres,* 340 U.S. at 146, 71 S.Ct. 153. The incident to service test, as stated by the United States Court of Appeals for the First Circuit,

> has become a talisman.... Courts have sought to determine whether an injury was incident to service by asking whether it occurred on a military facility, whether it arose out of military activities or at least military life, whether the alleged perpetrators were superiors or at least acting in

---

**15.** Under 28 U.S.C. § 610 (2000), the term "courts" includes "the courts of appeals and district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, the District Court of the Virgin Islands, the United States Court of Federal Claims, and the Court of International Trade."

cooperation with the military, and—often stressed as particularly important—whether the injured party was himself in some fashion on military service at the time of the incident. No single element in the equation, the Supreme Court has said, is decisive.

*Day v. Mass. Air Nat'l Guard,* 167 F.3d 678, 682 (1st Cir.1999) (citations omitted). In this case, each element is present. First, the conduct in which plaintiff engaged that gave rise to the investigations and charges preferred against him occurred on a military facility, Am. Compl. ¶ 11, and there is no indication that the injuries plaintiff asserts he sustained as a result of the Army's alleged wrongful conduct occurred away from military grounds. Second, plaintiff's claims arose out of military activities, namely military investigations into his conduct and proceedings arising therefrom. *Id.* ¶¶ 12–38. Third, the military personnel whom plaintiff alleges engaged in wrongful conduct were superiors or were acting in cooperation with the military. *Id.* ¶¶ 1–2, 6, 11, 13–17, 20–21, 23–27, 30–33, 37–38, 46–47, 50–53, 56, 58, 60, 62, 64, 67–72, 81, 83, 86, 90, 91. Finally, plaintiff was in military service as an enlisted soldier at all times.

Based upon the foregoing, the court concludes that plaintiff's claims fall within the parameters of the *Feres* doctrine's bar to suit, and a transferee court would lack jurisdiction to entertain them. Therefore, the court is unable to grant plaintiff's transfer request.

Alternatively, even if a transferee court were to possess jurisdiction over these claims, the court denies plaintiff's request for transfer. The term "interests of justice" contained in section 1631 "is vague, [and] district courts have a good deal of discretion in deciding whether to transfer a case." *Phillips,* 173 F.3d at 610. Plaintiff fails to articulate how "it is in the interests of justice" to transfer his claims to another court, 28 U.S.C. § 1631, and the court is unable to ascertain any justification for doing so.

## IV. CONCLUSION

Because Counts I, II, and III contain interwoven and various tort, constitutional, and statutory military pay claims, the court must separately enumerate its disposition of these claims such that an appropriate judgment may be entered. For the reasons discussed above and with respect to Counts I, II, and III, plaintiff's cross-motion is **DENIED** and defendant's motion is **GRANTED.** The Clerk of the Court is directed to dismiss Counts I, II, and III as follows:

1. Judgment on the administrative record pursuant to RCFC 52.1 with respect to all military pay claims (*see supra* Part III. A.3).

2. Dismissal for lack of jurisdiction, pursuant to RCFC 12(b)(1), of all claims:

a. sounding in tort (*see supra* Part III. A.1);

b. alleging Fourth Amendment and Fifth Amendment Due Process and Double Jeopardy Clause violations (*see supra* Part III.A.2); and

c. seeking removal of plaintiff's bar to reenlistment from the Army (*see supra* Part III.A.6).

3. Dismissal for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6), of all claims:

a. alleging ineffective assistance of counsel (*see supra* Part III.A.4);

b. requesting correction of military records (*see supra* Part III.A.5); and

c. asserting a Fifth Amendment liberty interest (*see supra* Part III.A.7).

Additionally, plaintiff's cross-motion is **DENIED** and defendant's motion is **GRANTED** with respect to Count IV. The Clerk of the Court is directed to dismiss Count IV for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).

**IT IS SO ORDERED.**